IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES McHUGH *and* CAROL McHUGH,

    Plaintiffs,

v.

UNITED STATES OF AMERICA

    Defendant.

Civil Action No.

JURY TRIAL DEMANDED

CIVIL ACTION COMPLAINT

## CIVIL ACTION COMPLAINT

Plaintiffs, James McHugh and Carol McHugh, by and through their undersigned counsel, do hereby aver the following:

### JURISDICTION AND VENUE

1. This action is brought pursuant to 28 U.S.C.S. § 1346(b), the Federal Tort Claims Act, for medical malpractice committed by the Wilkes-Barre VA Medical Center, in Wilkes-Barre, Pennsylvania, and its medical personnel and/or employees.

2. This Court has supplemental jurisdiction over Plaintiffs' state law claims because those claims arise out of the same nucleus of operative fact as their federal law claims.

3. The venue in this district is proper pursuant to 32 C.F.R. § 750.32, as Plaintiff resides in Berks County, Pennsylvania.

### PARTIES

4. Plaintiff, James McHugh, is an adult individual and citizen of the Commonwealth of Pennsylvania, residing at 55 Clay Valley Road, Fleetwood, PA 19522.

5. Plaintiff, Carol McHugh, is an adult individual and citizen of the Commonwealth of Pennsylvania, residing at 55 Clay Valley Road, Fleetwood, PA 19522.

1

6. Defendant is the United States of America ("United States"), for purposes of this action and for notice, and is located at 950 Pennsylvania Avenue NW., Washington, D.C. 20530.

7. Defendant at all relevant times hereto acted by and through, and is liable for, its agencies, the U.S. Department of Veterans Affairs and Wilkes-Barre VA Medical Center.

8. The Department of Veterans Affairs is a federal agency that provides a variety of benefits, including healthcare services, to servicemembers and veterans, and maintains a place of operation, headquarters, and/or business at 810 Vermont Avenue NW., Washington, D.C. 20571.

9. Wilkes-Barre VA Medical Center (hereinafter "VAMC") is a federally funded health center receiving funding through the U.S. Department of Veterans Affairs, which at all relevant times maintained offices and/or a place of business at 1111 East End Blvd., Wilkes-Barre, PA 18711.

10. At all times material hereto, VAMC acted through its employees, agents, servants, and/or ostensible agents in providing medical care to Plaintiff, James McHugh, at the aforementioned location. Its employees, acting in the scope of their federally funded employment, are covered by the Federal Tort Claims Act.

11. Rebecca J. Odorizzi, D.O. (hereinafter "Dr. Odorizzi") is a physician specializing in family medicine, who is upon information and belief, at all relevant times, licensed to practice medicine in the Commonwealth of Pennsylvania, having a regular practice at VAMC, and who held herself out as a specialist in the field of family medicine.

12. At all times material hereto, Dr. Odorizzi was the employee, servant, agent, and/or ostensible agent of VAMC and acting within the course and scope of her employment with VAMC.

13. Adil A. Khan, M.D. (hereinafter "Dr. Khan"), is a physician specializing in neurology, who is upon information and belief, at all relevant times, licensed to practice medicine in the Commonwealth of Pennsylvania, having a regular practice at VAMC, and who held himself out as a specialist in the field of neurology.

14. At all times material hereto, Dr. Khan was the employee, servant, agent, and/or ostensible agent of VAMC and acting within the course and scope of her employment with VAMC.

15. Sharon Schell, R.N. (hereinafter "Ms. Schell") is a registered nurse, who is upon information and belief, at all relevant times, duly licensed in the Commonwealth of Pennsylvania, and was engaged in providing medical care, treatment, and/or services to patients at VAMC.

16. At all times material hereto, Ms. Schell was the employee, servant, agent, and/or ostensible agent of VAMC and acting within the course and scope of her employment with VAMC.

17. Andreia Gafton, M.D. (hereinafter "Dr. Gafton"), is a radiologist who is upon information and belief, at all relevant times, licensed to practice medicine in the Commonwealth of Pennsylvania, having a regular practice at VAMC, and who held herself out as a specialist in the field of radiology.

18. At all times material hereto, Dr. Gafton was the employee, servant, agent, and/or ostensible agent of VAMC and acting within the course and scope of her employment with VAMC.

19. At all times material hereto, Defendant, United States of America, is and was vicariously liable for all acts and omissions of VAMC, as well as all acts and omissions of

Rebecca Odorizzi, D.O., Adil Khan, M.D., Sharon Schell, R.N., and Andreia Gafton, M.D. committed within the course and scope of their employment at VAMC, as described more fully herein, under the Federal Tort Claims Act (FTCA).

20. Defendant United States is vicariously liable to Plaintiffs for injuries and losses sustained as a result of the negligent acts and omissions of any and all persons and/or entities under its supervision, control, and/or right of control, and conduct which increased the risk of, and, in fact, did cause James McHugh catastrophic injuries as described herein.

21. At all relevant times, Defendant engaged as its actual, apparent and/or ostensible agents, servants and employees various healthcare providers, physicians, residents, fellows, interns, physician assistants, physician extenders, nurse practitioners, emergency medical personnel and other ancillary staff who provided, participated in and/or were responsible for the emergency medical care, management, treatment and clinical decision making for James McHugh at all times described herein, who at all times were acting within the course and scope of their agency and/or employment with Defendant and under its exclusive control.

22. Defendant is liable for the negligent acts and/or omissions of its actual, apparent and/or ostensible agents, servants and employees under theories of respondeat superior, master-servant, agency, and/or right to control. The identities of these agents, servants and employees, to the best of plaintiffs' knowledge, information and belief after reasonable investigation, include Rebecca Odorizzi, D.O., Adil Khan, M.D., Sharon Schell, R.N., and Andreia Gafton, M.D.

23. At all relevant times Rebecca Odorizzi, D.O., Adil Khan, M.D., Sharon Schell, R.N., and Andreia Gafton, M.D., were the actual, apparent and/or ostensible agents and/or employees of Defendant and were acting within the course and scope of their agency and/or employment with Defendant while providing management, care, decision making, and/or

4

treatment to James McHugh. Accordingly, Defendant is vicariously liable for the negligent acts and omissions of Rebecca Odorizzi, D.O., Adil Khan, M.D., Sharon Schell, R.N., and Andreia Gafton, M.D., in their care, treatment, decision making and/or management of James McHugh under theories of respondeat superior, master-servant, agency and right of control.

24. Defendant's agents also include those physicians, residents, fellows, interns, physician assistants, physician extenders, nurse practitioners, nurses, technicians and/or other ancillary staff who participated in, were consulted about and/or were otherwise involved and/or responsible for the clinical evaluation, assessment, work-up, management, treatment, observation and/or clinical decision making for James McHugh at all times described herein, whose names and/or handwriting appear in the medical charts, but are indecipherable, or whose notes do not appear in the charts, but who were consulted about the condition and/or treatment of James McHugh by other defendants and/or their agents whose names do appear in the medical chart. The identities of these individuals are known only to the Defendant and are not known or knowable by Plaintiffs after reason able investigation and review of the provided medical record and/or chart and, and will require additional discovery from defendants as the litigation proceeds.

25. At all relevant times, all Defendant acted directly and/or by and through their duly authorized agents, servants and employees, as defined herein, who themselves were acting within the course and scope of their employment and/or agency with one or more of the defendants.

26. At all relevant times, Defendant owed non-delegable legal duties directly to James McHugh pursuant to Thompson v. Nason, 591 A.2d 703 (Pa. 1991), and its progeny of case law, including Welsh v. Bulger, 698 A.2d 581 (Pa. 1997) and Whittington v. Woods, 768 A.2d 1144 (Pa. Super. 2001). These duties consisted of: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent

physicians; (3) a duty to oversee all persons who practice medicine within their facilities as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

27. At all relevant times, James McHugh was under the medical care, treatment and attendance of the Defendant directly, or indirectly through their actual and/or ostensible agents, servants and employees who participated in James McHugh's care at all times described herein.

28. At all relevant times, a physician-patient and/or nurse-patient relationship existed between James McHugh and Defendant, as well as with Defendant's, actual and/or ostensible agents, servants and employees, as defined herein.

29. At all relevant times, Defendant and/or their agents, servants and employees were engaged in the practice of medicine, pursuing their respective specialties and/or health care duties, and/or were obligated to use the professional skill, knowledge and/or care which they possessed, and to pursue their profession in accordance with reasonably safe and accepted standards of medicine and professional care in general, and in their specialties in particular, as well as institutional standards of care, in their care and treatment of James McHugh.

30. At all relevant times, the Defendant and/or their agents, servants and/or employees had actual and/or constructive knowledge of the medical and professional care and/or treatment provided to James McHugh.

31. At all relevant times, Plaintiff, James McHugh, looked to Defendant to provide him with medical physicians and nurses who were competent and adequately trained with respect to the applicable standards of medical care in the timely and proper care and management of medical patients such as himself.

32. At all relevant times, Plaintiff, James McHugh, believed that the physicians, nurses and/or other members of the medical team assigned to his care at all times described herein were employed by Defendant.

33. Defendant selected and assigned to James McHugh, physicians, nurses and/or other ancillary personnel to implement, monitor and manage his medical care and to make decisions, were neither properly skilled, nor adequately trained to manage medical patients like James McHugh.

34. At all relevant times, James McHugh looked to and relied upon the professional knowledge, care, skill, treatment and/or advice of Defendant and their agents, servants and employees.

35. The carelessness and negligence of the Defendant and their actual and ostensible agents, servants and employees and each of them, jointly and severally, as described herein, caused, created and increased the risk of and actual harm to James McHugh, and were substantial factors in causing the catastrophic injuries to James McHugh, as described herein.

36. The catastrophic injuries to James McHugh were caused solely and exclusively by the negligent acts and omissions of Defendant and their agents, servants and/or employees, as defined herein, and were due in no manner to any act or failure to act on the part of James McHugh.

## FACTS

37. James McHugh is a 47-year-old ex-marine sniper who served two (2) tours in the Middle East.

38. Mr. McHugh's primary care physician is Defendant Rebecca Odorizzi, D.O. of VAMC.

7

39. In December 2015, Mr. McHugh was seen by a neurologist, Defendant Adil Khan, M.D. at the VAMC neurology clinic for recurring migraines and was treated with Topamax and Imitrex.

40. In February 2016, Mr. McHugh was seen by Dr. Odorizzi for complaints of chronic low back pain, GERD, nicotine dependence, ED, impaired fasting glucose, and migraine headaches. He denied chest pain, shortness of breath, palpitations, diaphoresis, GI, GU, or neurological symptoms. Dr. Odorizzi wrote in her progress note, "heart murmur—needs echo—will speek with his pcp to see if can get done locally, last echo was many years ago; will schedule EKG."

41. On March 9, 2016, Mr. McHugh underwent an echocardiogram at VAMC, which revealed: trace tricuspid regurgitation, mild concentric left ventricular hypertrophy, bilateral enlargement, mitral valve prolapse posterior leaflets with mitral valve thickening, moderate mitral regurgitation, biatral enlargement, and mild pulmonary hypertension. Dr. Odorizzi noted "can inform veteran that EKG was normal, echo showed a leaky mitral valve; normal heart function; will need to follow this with another echocardiogram in about 9-12 mos."

42. On March 14, 2016, Mr. McHugh notified Dr. Odorizzi that he was "having intermittent left elbow/shoulder/chest pain usually once a week that occurs with or without exertion and can be associated with left chest pressure (like squeezing a balloon)." Dr. Odorizzi suggested Mr. McHugh see cardiology for further evaluation.

43. In early- to mid-May 2016, Mr. McHugh was treated at urgent care for vomiting, sweats, and non-productive cough, and was prescribed a course of azithromycin, and subsequently levofloxacin, for presumed bronchitis.

44. On May 25, 2016, Mr. McHugh was admitted to Lehigh Valley Hospital (hereinafter "LVH") because of night sweats, weight loss, cough, vomiting, a fall, leg pain, and difficulty walking. He complained that he fell because he could not feel his leg, and reported that he felt like he had a leg cramp. Additionally, he could not bear weight on his leg because of foot pain, and reported feeling a lump on his right thigh. He additionally reported that one of the urgent care centers had told him that he had strep throat.

45. Upon arrival at LVH, Mr. McHugh was seen in the emergency department and was afebrile and tachycardic. His blood pressure was stable. He had a high white blood cell count (17.3), high sed rate (78), high C-reactive protein (293), high erythrocyte sedimentation rate and elevated troponin. A CT scan of the chest was negative for pulmonary embolism.

46. Blood cultures done on May 25 and May 26 were negative.

47. On May 27, 2016, a transesophageal echocardiography (TEE) was done and showed no vegetation.

48. Cardiology recommended a stress test and neurology was consulted due to lower extremity pain, which was suggested to be radicular.

49. An echocardiogram was done due to concern for endocarditis and murmur. The results showed thickened mitral valve leaflets with normal leaflet separation; posterior leaflet prolapse with flail P1/P2 segments; severe eccentric mitral regurgitation directed anteriorly along the intervalvular fibrosa; mild focal thickening of the intervalvular fibrosa, likely inflammatory in etiology secondary to severe mitral regurgitation; and left ventricle ejection fraction is 85%.

50. Mr. McHugh demonstrated no focal deficits on exam and a May 30, 2016 MRI of the brain showed no acute stroke. An MRI of the back showed mild degenerative lumbar disease.

51. The MRI of the brain done on May 30, 2016 showed: no acute intracranial findings, punctate foci of high signal on fluid sensitive sequences involving the left cerebellar hemisphere which were nonspecific but could represent remote infarcts, punctate focus of low signal involving the left frontal lobe on susceptibility weighted imaging which could represent remote microhemorrhage, mineralization or vascular lesion.

52. The TEE performed on May 27, 2016 revealed thickened mitral valve leaflets and severe eccentric mitral regurgitation. There was mild troponin elevation with EKG changes for classical angina and it was decided to do an output stress test.

53. During his stay at LVH, he received a dose of ceftriaxone, and eventually improved and was stable for discharge on May 31.

54. On May 31, 2016, Mr. McHugh Mr. McHugh was discharged from LVH.

55. Taken together, Mr. McHugh's symptoms, including mitral regurgitation (which had progressed from moderate in March to severe in June), fevers, sweats, swollen ankle, back pain, and focal neurological problems affecting his right leg, all point to a clinical diagnosis of infectious endocarditis.

56. On June 3, 2017, Mr. McHugh presented to VAMC and was evaluated for possible TB as he was unable to walk. Mr. McHugh was scheduled for a follow up appointment on June 7, 2016 at VAMC with Dr. Odorizzi. According to his progress notes, Mr. McHugh was "told to have [blood work] completed asap at the VA."

57. On June 6, 2016, Mr. McHugh cancelled his appointment with Dr. Odorizzi and went to his non-V.A. primary care physician, Dr. Velarde.

58. It was noted in Dr. Odorizzi's progress notes dated June 6, 2016 that Mr. McHugh was "dx with hx of 3 cva's and MVR. Had extensive work up and was told last week that his TB test was +. He needed it repeated and Dr. Velardi repeated it on 6/4/16. Awaiting results."

59. On June 8, 2016, Mr. McHugh saw Dr. Odorizzi for a follow-up appointment and complained of right ankle pain, swelling, and fevers. Dr. Odorizzi noted fevers of up to 103 degrees. She also noted that Mr. McHugh was scheduled for a nuclear stress test but had to reschedule due to inability to walk on a treadmill.

60. Dr. Odorizzi neglected to give Mr. McHugh an emergency room referral at this time, although doing so would have been appropriate as his symptoms were strongly suggestive of endocarditis.

61. On June 9, 2016, Mr. McHugh returned to Dr. Odorizzi's office with extreme dizziness, unsteady gait, vomiting, diarrhea, and diaphoresis. Dr. Odorizzi suggested an ER evaluation at LVH.

62. In the following days, Mr. McHugh developed blurred vision, double vision, headaches, and worsening right leg weakness.

63. On June 11, 2016, Mr. McHugh was seen in the emergency room at LVH. Defendant Susan Schell, R.N. of VAMC noted "Follow up call to secure message today, Veteran seen in LVH ER on 6/11/16, per wife. Prior to arrival he had a temp of 102.6 and he seemed like he was having a stroke." She also noted "he has not had follow up labs at the VA or seen the podiatrist."

64. On June 14, 2016, Mr. McHugh's wife, Plaintiff Carol McHugh, sent an email to Nurse Schell at VAMC, stating that Mr. McHugh was experiencing additional issues since his last appointment of June 8, 2016, including vomiting, dizziness, blurred vision, double vision,

11

severe headaches, extreme weakness in his right leg, slurred speech, and stated that he "has literally slept away every day since May 22 (24 days)." She also stated that he "just didn't feel right" and that he had begun running a temperature of 103. She additionally stated that he went back to LVH, was treated for migraine, and sent home. She stated that "he has not been 'right' since April 27."

65. On June 13, 2016, Mr. McHugh saw Dr. Patel at The Heart Care Group, who scheduled a nuclear stress test for June 21, 2016. Mrs. McHugh reported via email to Dr. Odorizzi and Nurse Schell at VAMC that "Dr. Patel plans to follow the leaking mitral valve closely until he feels it's the right time to replace it." She additionally reported via email to Dr. Odorizzi and Nurse Schell that "we really need to get to the bottom of this as he has been ill for some time. We have left several messages at [VAMC] and really would like to get a call back as soon as possible."

66. On June 14, 2016, Mrs. McHugh made a phone call to Dr. Odorizzi's office and indicated that therapy was ordered for Mr. McHugh's leg.

67. Additionally, on June 14, 2016, **an MRI of the brain was ordered for June 24, 2016, with a follow-up appointment scheduled for June 27, 2016 with neurologist, Defendant Dr. Khan, to review the findings**. This MRI was ordered on an emergent basis to rule out any potential neurological issues.

68. Nevertheless, Dr. Odorizzi failed to obtain a timely follow-up on the MRI that she ordered and failed to communicate effectively regarding Mr. McHugh's care with consultant physician(s), including Dr. Khan.

69. The June 24, 2016 MRI findings were concerning for intracranial infection including meningitis.

70. On June 27, 2016, **Dr. Khan mistakenly reviewed the earlier MRI from LVH of May 30, 2016, and not the more recent MRI of June 24, 2016**.

71. **Because Dr. Khan reviewed the wrong MRI, he advised Mr. and Mrs. McHugh that the MRI results were normal**.

72. Dr. Khan evaluated Mr. McHugh for headaches, unsteadiness, back, and right leg pain. His noted tenderness in the lower back and in the paraspinal regions throughout the "dorsal and lumbar spine." Reflexes were not examined. Dr. Khan concluded that Mr. McHugh had musculoskeletal pain syndrome and no evidence of sciatica or lumbar radiculopathy.

73. Unsteadiness, however, is not in general a symptom of musculoskeletal pathology, and much more likely a symptom of brain or possibly peripheral vestibular dysfunction.

74. There was further delay in Mr. McHugh's care because Dr. Khan reviewed the previous MRI and not the later one done of June 24.

75. Additionally, **the final report of the June 24 MRI was not reviewed and signed by the radiologist, Andreia Gafton, M.D., until June 29**. This is an unacceptable delay that further compromised Mr. McHugh's care and delayed treatment with antibiotics.

76. The finding of intracranial infection is an emergency and required nonroutine communication (phone call) by the radiologist to the referring physician—this was not performed.

77. Not only was there a delayed interpretation of the MRI study by Dr. Gafton (5 days), but the diagnosis was further delayed by her failure to directly notify the treating physician(s) of the patient's intracranial infection.

78.     Dr. Gafton's failure to call the report to the referring physician reflects a deviation from the standard of care.

79.     Additionally, Dr. Khan should have attempted to locate the images of the June 24th study and should have reviewed them personally with the radiologist, Dr. Gafton.

80.     Dr. Gafton was required to review the MRI in a very specific time frame due to the emergent nature of the abnormalities it revealed, however she also failed to timely review and follow up on the MRI with Dr. Khan.

81.     The June 24 MRI study clearly showed abnormalities that pointed to a diagnosis of a brain infection and would have undoubtedly led to rapid institution of antibiotic therapy if it had been timely reviewed per the standard of care.

82.     The repeated delays by Dr. Odorizzi, Dr. Khan, Dr. Gafton, and VAMC led to delays in treatment of endocarditis, which led to increased neurologic deficits and to more severe prolonged deficits than Mr. McHugh would have otherwise had.

83.     Over the next week, Mr. McHugh continued to have progressive and worsening symptoms, and Mrs. McHugh made several phone calls to Dr. Odorizzi, which were never returned.

84.     On July 5, 2016, Mrs. McHugh emailed Dr. Odorizzi and Nurse Schell requesting an appointment with Dr. Odorizzi.

85.     On July 6, 2016, Nurse Schell called Mrs. McHugh and told Mrs. McHugh to take Mr. McHugh to the emergency room at LVH as soon as possible because the June 24, 2016 MRI showed an infection in his brain.

85.     Dr. Odorizzi stated in her progress notes dated 7/6/16 that she "Spoke with Dr. Khan regarding MRI results from [VAMC] – [VAMC] results were not available at time of

consult (he was reviewing Lehigh MRI) – MRI from [VAMC] shows possible infectious or inflammatory process going on – which could explain his symptoms – he is going to need a spinal tap to get to the bottom of this – I think the best way to handle this is for him to go back to the ER for evaluation and get the spinal tap – we can send MRI reports/labs, etc."

86. Mr. McHugh was readmitted to LVH during his ER visit and it was noted that he suffered from fever and chills for over six (6) weeks with neurologic symptoms including ataxia with some difficulty word finding. The MRI from VAMC showed multiple lesions, which were concerning for either infection or infarcts. It was also noted that "patient just learned of a 'mitral valve prolapse problem' from his cardiologist."

87. TEE results showed severe mitral valve regurgitation with vegetation and a cervical spine MRI showed constellation of findings consistent with discitis osteomyelitis.

88. During his hospitalization, Mr. McHugh was catheterized and was diagnosed with *Staphylococcus lugdenensis* bacteremia and endocarditis of the mitral valve (based on positive blood cultures, and echocardiograms that showed large vegetation on the mitral valve and severe mitral regurgitation).

89. Mr. McHugh developed septic shock which necessitated the use of vasopressors and mechanical ventilation.

90. He also developed renal failure which necessitated the institution of hemodialysis.

91. On July 14, 2016, Mr. McHugh underwent valve replacement surgery, with operative findings that included mitral valve vegetation and an abscess.

92. While he was sedated prior to the valve surgery, Mr. McHugh developed kidney issues, a collapsed lung, and a brain hemorrhage.

93. He was put on dialysis and transferred to Good Shephard Rehabilitation Hospital ("Good Shephard") on July 27, 2016.

94. He received nafcillin for many weeks with eventual cure of the infection.

95. Since being transferred to Good Shephard, he continued dialysis treatment but had to be transferred between Good Shephard facilities for a change of antibiotics, where he remained for nearly four additional weeks.

96. On September 9, 2016, Mr. McHugh was released from Good Shephard and received outpatient therapy at Good Shephard with a follow up for Coumadin.

97. Mr. McHugh has been suffered from a host of neurological deficit issues since.

98. Mr. McHugh's bacterial infection (*S. lugdenensis*) caused his endocarditis, which destroyed his valve, necessitated his valve replacement surgery, and resulting in the ensuring cascade of events described in detail above.

99. Defendants' delayed treatment of Mr. McHugh's infection resulted in septic shock, strokes, spinal infection, and kidney failure (and dialysis requirement), among other things.

100. Mr. McHugh's complaints of continued fever and weakness should have prompted a more comprehensive earlier work-up and a diagnosis should have been made immediately after the June 24, 2016 MRI under the applicable standard of care.

101. Defendants' failure to promptly act after Mr. McHugh's ongoing complaints, and Defendants' failure to make the appropriate diagnosis immediately after the June 24, 2016 MRI breached the standard of care.